J-A29026-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: A.P.G. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.M.H. | No. 85 WDA 2015 |

Appeal from the Order Entered December 12, 2014,
in the Court of Common Pleas of Blair County, Orphans' Court,
at No(s): No. 2014 AD 42

BEFORE:  FORD ELLIOTT, P.J.E., BOWES, and MUSMANNO, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED DECEMBER 23, 2015**

K.M.H. ("Mother") appeals from the orphans' court order entered on December 12, 2014, which denied her petition to involuntarily terminate the parental rights of J.R.C., Jr. ("Father") to her minor son, A.P.G.  After careful review, We reverse.

A.P.G. was born during March of 2011, as a result of Mother's brief relationship with Father.  N.T., 10/27/14, at 7, 14.  Over the next several years, Mother and Father rarely spoke to one another, and Father remained absent from A.P.G.'s life.  Father never visited with A.P.G., sent gifts, or provided Mother with financial assistance to care for him.  *Id.* at 15. Meanwhile, Mother began dating J.C.H. ("Stepfather").  Mother and Stepfather began living together in August of 2011.  They married in November of 2012.  *Id.* at 12, 18.

On July 14, 2014, Father sent Mother a message via Facebook asking to see A.P.G.  Mother responded by requesting that Father allow A.P.G. to be

adopted by Stepfather, and Father refused. On July 24, 2014, Father filed a *pro se* complaint for custody of A.P.G. Approximately one month later, Mother filed a petition to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), regarding a parent's failure or refusal to perform parental duties. On the same date, Mother and Stepfather filed a petition for adoption that identified Stepfather as the prospective adoptive parent.

A termination hearing was held on October 27 and 29, 2014. Mother testified in support of the petition for termination and proffered two witnesses: her husband and Lynn E. Kagarise, an expert in the field of forensic child psychology. Father testified and called two witnesses. Following the close of evidence, the court-appointed guardian *ad litem* filed a memorandum in support of terminating Father's parental rights pursuant to § 2511(a)(1).

On December 12, 2014, the orphans' court denied Mother's petition to terminate parental rights. Essentially, the trial court concluded that, although Mother established that Father had neglected to perform his parental duties to their son, Father's inaction was the direct result of obstacles Mother erected. Furthermore, the court credited Father's explanation that he attempted to rekindle a relationship with Mother, because it provided him a mechanism to establish contact with A.P.G. Mother timely filed a notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

She raises the following issues for our review.

1. Whether the trial court erred when it denied and dismissed [Mother's] Petition for Involuntary Termination of Parental Rights based upon an analysis and conclusion that [Father] did not evidence a settled purpose of relinquishing a parental claim to the child, rather than upon the evidence and testimony clearly indicating that [Father] failed to perform parental duties for a period in excess of six months immediately preceding the filing of the Petition[?]

2. Whether the trial court erred in determining that [Mother] created such significant obstacles so as to thwart [Father's] ability to have contact with the child and perform his parental duties[?]

3. Whether the trial court failed to give adequate consideration to the testimony of the expert witness when it denied and dismissed [Mother's] Petition for Involuntary Termination of Parental Rights[?]

Mother's brief at 3.

We consider Mother's claims mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

-3-

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, Mother "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.*, 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203–04 (Pa. 1989).

As noted, Mother sought to terminate Father's parental rights pursuant to § 2511(a)(1) and (b), which provides as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > . . . .
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

With respect to § 2511(a)(1), this Court has explained,

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. The court should consider the entire background of the case and not simply:

. . . mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re A.S.*, 11 A.3d 473, 482 (Pa. Super. 2010) (citations omitted).

Regarding the definition of "parental duties," we have stated,

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004).

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must then engage in three additional lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b). *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008).

Mother's second issue is dispositive. In explaining its rationale for denying Mother's petition to terminate Father's parental rights, the orphans' court acknowledged that Father failed to perform parental duties for A.P.G.; however, it determined that Father's failure to perform parental duties was a result of obstacles created by Mother. The court emphasized, *inter alia*, Father's interest in attending his son's birth, his attempts to contact Mother at work, and his conversations with Mother on Facebook. The court further highlighted Father's request to see then-three-year-old A.P.G. during July of

2014, and the ensuing complaint for custody he filed in response to Mother's refusal.

Mother argues that the trial court erred in concluding that the hurdles that Father faced were so insurmountable as to excuse his failure to perform parental duties.[1]  After a thorough review of the record in this matter, we agree with Mother's contention that the orphans' court erred in denying Mother's petition to terminate Father's parental rights pursuant to § 2511(a)(1) and (b).

Plainly, Father failed to perform "parental duties" as we defined the phrase in **In re A.S.**, **supra**.  During the termination hearing, Mother testified that she and Father remained in contact for only "a few weeks" after Mother discovered that she was pregnant in July of 2010.  N.T., 10/27/20, at 7-8.  Mother resided at the residence of A.P.G.'s maternal grandmother at that time, and remained there until June of 2011.  **Id**. at 9-10.  After Mother moved, she did not provide her new address or phone number to Father, because Father "was not in contact with [her]." **Id.**  As noted *supra*, Mother has lived with Stepfather since August of 2011, and married him in November of 2012.  **Id.** at 12, 18.  Father has never seen

---

[1] Father asserts that this argument is waived because the question Mother raised in her statement of questions presented challenged only the court's finding that Mother erected barriers to Father's contact.  We disagree.  As noted on page three of our memorandum, Mother assailed the orphans' court's determination that the barriers thwarted Father's ability to contact A.P.G. or perform his parental duties.  That assertion necessarily brings into question Father's efforts to overcome the alleged barriers.

A.P.G., never provided gifts or financial assistance for A.P.G., and never attended any of A.P.G.'s medical appointments. *Id.* at 15-16.

Additionally, Father admitted during the evidentiary hearing that he neglected to purchase A.P.G. clothing or diapers, provide child support, or attend his doctor's appointments. N.T., 10/29/14, at 68. He also acknowledged that he failed to send his son any letters, cards, or presents prior to the date that Mother filed the petition for termination. *Id.* Hence, it is beyond peradventure that, since his son's birth, Father either failed or refused to perform parental duties.

Moreover, the certified record will not sustain the trial court's finding that the restrictions that Mother imposed on Father's contact with his son were overwhelming. In this regard, Mother testified that she began working as a cashier at the local Wal-Mart in September of 2011. N.T., 10/27/14, at at 11. Mother occasionally would see Father while working, but Father never approached her to discuss A.P.G. *Id.* Mother stated that, on one occasion, "[w]hen I wasn't working, he checked out directly behind me and never said a word to me." *Id.* Mother acknowledged that she spoke with Father at a bar in November of 2012, and that Father had her new cellular telephone number at the time. *Id.* at 12-13. Mother later engaged in Facebook conversations with Father, and spoke with Father at Wal-Mart. *Id.* at 21, 25, 32-33. Mother insisted that her communications with Father were

always "about us," and that Father "never specifically asked about [A.P.G.]." *Id.* at 33.

While Mother acknowledged that Father continued to contact her after November of 2012, she testified that this contact also was not about A.P.G. *Id.* at 14. Rather, "[i]t was always about trying to get me back." *Id.* According to Mother, Father continued to send text messages attempting to rekindle a relationship with her, despite the fact that Father was dating someone, and Mother was married. *Id.* As a result, Mother changed her phone number again in the "summer or fall of 2013." *Id.* Mother also blocked Father on Facebook. *Id.* Mother insisted that Father did not express any interest in A.P.G. until he sent her a message using a new Facebook account in July of 2014. *Id.* at 14, 21, 29.

Stepfather testified consistently with Mother. He stated that Mother has not hidden A.P.G. from Father or attempted to create any barriers between Father and A.P.G. *Id.* at 74. He also stated that he has seen Father at Wal-Mart over a dozen times since he began his relationship with Mother, and while Father as approached him to inquire about Mother, he never asked about A.P.G. *Id.* at 60-62.

As it relates to the trial court's finding that Father employed reasonable firmness to overcome the barriers that Mother allegedly erected, we summarize Father's description of his efforts as follows. Father testified that he spoke with Mother on the telephone about a week prior to A.P.G.'s

birth during March of 2011, and Mother informed him that she was scheduled to have labor be induced. N.T., 10/29/14, at 19. She provided Father with the date of the procedure, but she did not provide him with the name of the hospital where the birth would take place. *Id.* at 20. Father claimed that Mother originally agreed to meet with him a few days prior to A.P.G.'s birth in order to discuss how he was going to be involved A.P.G.'s life. *Id.* at 19. That meeting never took place, as Mother would not return Father's calls and text messages. *Id.* at 20. On the day A.P.G. was born, Father traveled to two local hospitals, and called a third hospital, in an unsuccessful effort to locate Mother and A.P.G. *Id.* at 21.

Father further testified that he encountered Mother and A.P.G. at Wal-Mart about two months after the child's birth; however, "[a]s soon as [Mother] turned around and saw me, she immediately took off outside of the store[.]" A month or two later, Father received a text message from a friend alerting him to the fact that Mother and A.P.G. were again shopping at Wal-Mart. *Id.* at 24. Father explained that he left work and rushed to Wal-Mart. *Id.* Once there, Father located Mother, but as he put it, "[A]s soon as she saw me, she had darted off, zig-zagging through aisles to get to the back of the electronics department where [Stepfather] was at the time." *Id.* at 24-25.

Father continued that he was not aware that Mother had moved out of the maternal grandmother's residence in June of 2011, and that he visited

the home of the maternal grandmother twice approximately six or seven months after A.P.G. was born. *Id.* at 25-26. On the first occasion, no one was home. *Id.* The second time, a woman Father did not recognize came to the door and told him that Mother no longer lived there. *Id.* Father testified that he conducted searches on the internet in an effort to determine where Mother had moved. *Id.* at 26-27. Father could not find Mother's address, and was unable to reach her on the telephone. *Id.* at 29-30. Father recounted that he sent Mother a message using Facebook during Thanksgiving of 2011. *Id*. at 28. He wished Mother a happy Thanksgiving and asked to see A.P.G. *Id.* She did not respond to this message. *Id*. at 29.

Father stated that Mother did not communicate with him again until she initiated contact with him using a friend's Facebook account in November of 2012. *Id.* at 29. He spoke with Mother for approximately sixty to ninety minutes. *Id.* at 31. Father asked about A.P.G., but he did not request to see him. *Id.* at 33. After that meeting, Father had follow-up conversations with Mother where they discussed their son. *Id.* at 33. During these talks, Mother indicated that she did not want Father to be involved in A.P.G.'s life until the child was older. Father acquiesced to the request and did not insist upon meeting his son. In written response to a Facebook post, Father wrote, "[I] understand your reasoning for things and I completely agree . . . it would kinda [*sic*] mess [Father's other son] up in

-11-

ways as well . . [.] he wouldn[']t understand." *See* Respondent's Exhibit 2 at 24.

During a subsequent meeting, Father also acquiesced to Mother's insistence that he forego buying his son a Christmas present. N.T., 10/29/14, at 38. By Easter of 2013, Mother had terminated contact with Father and blocked him on Facebook. *Id.* at 37, 39-40. More than one year later, during the summer of 2014, Father reestablished contact and for the first time demanded to see A.P.G. *Id.* at 37, 53.

Father's primary excuse for failing to bypass Mother in order to establish a relationship with his son was that he only recently discovered that he had parental rights and his ability to pursue those rights through the court system. *Id.* at 70-71. Father also asserted that he wanted to avoid the courts for economic reasons, was afraid of inciting an altercation with Mother and Stepfather, and eschewed police involvement. *Id.* at 73. Father admitted that his discussions with Mother in November of 2012 focused primarily on his relationship with her, but claimed that, "[A.P.G.] factor[ed] into all of it . . . It was an ultimate end goal being in [A.P.G.'s] life[.]" *Id.* at 77.

Father's girlfriend, B.F., testified that she has known Father since January of 2013, and reported that Father has attempted to see A.P.G. by sending Mother text messages. N.T., 10/29/14, at 9. She specifically referenced text messages Father sent Mother during the summer of 2013, in

which he asked about his son. *Id.* at 15. She also referenced text messages Mother and Father exchanged during Easter of 2013, but she did not recall whether the parties discussed A.P.G. *Id.*

Our review of the certified record confirms that Mother established by clear and convincing evidence that Father failed to utilize available resources to establish a parental relationship or exercise reasonable firmness to resist the obstacles that he claims Mother erected. For the first nineteen months of A.P.G.'s life, Father made only five attempts to contact him. Specifically, Father tried to visit A.P.G. at the hospital, attempted to speak with Mother at Wal-Mart, visited the home of the maternal grandmother twice, and sent Mother a Facebook message. Later, during November of 2012, Father engaged in extended discussions with Mother, both in person and online, and discovered the approximate location of Mother's home; however, he did not seek custody of his son and did not insist on visiting the child. Instead, Father agreed with Mother's perspective that it would be best not to meet his son until the child matured. Thereafter, Father made almost no effort to contact A.P.G. At best, Father sent Mother text messages asking about A.P.G. in the summer of 2013. When Mother terminated that communication and blocked Father on Facebook, he simply gave up and made no further attempts until he sent Mother another message during July of 2014.

While it is true that Father made an isolated request to see A.P.G. during July 2014, and ultimately filed a complaint for custody when the July 2014 request was denied, it is well-settled that courts must consider the whole history of the case and not "mechanically apply the six-month statutory provision." **A.S.**, 11 A.3d at 482. Here, our examination of the entire history of this case reveals that Father failed to exercise reasonable firmness in order to overcome the obstacles that he alleges that Mother created and he abdicated all parental responsibility with respect to A.P.G. until July of 2014.

As the record establishes that Father's efforts were insufficient, the trial court erred in rejecting Mother's petition to terminate on that basis. **In re B.,N.M.**, **supra** at 855 ("A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship."); **see also In re C.M.S.**, **supra** at 464 (rejecting trial court's reasoning that mother's behavior excused father's failure to maintain contact with his daughter because father failed to exercise reasonable firmness in attempting to overcome those obstacles). Accordingly, we reverse the order of the orphans' court denying the petition to terminate Father's parental rights with respect to § 2511(a)(1).

We next consider whether the termination of parental rights would best serve A.P.G.'s developmental, physical, and emotional needs and

welfare pursuant to § 2511(b). We have discussed our analysis under § 2511(b) as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id**. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa.Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id**. at 63.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa.Super. 2010).

Herein, child psychologist Lynn E. Kagarise was qualified as an expert in the area of child psychology addressing the impact of termination of parental rights upon children of A.P.G.'s age and maturity. N.T., 10/27/14, at 39-40. Mr. Kagarise has practiced clinical and forensic child psychology since 1987. **Id**. at 38. He proffered expert opinion testimony in several hundred cases involving custody and termination of parental rights in various jurisdictions in the Commonwealth. **Id**.

While Mr. Kagarise never examined A.P.G., he was familiar with the essentials of the case, *i.e.*, a three-and-one-half year old child who has never had contact with his biological parent. **Id**. at 44. In essence, Mr. Kagarise opined within a degree of psychological certainty that terminating

an absentee parent's parental rights does not result in any psychological harm to a child because the absence creates "a vacuum, an emptiness, [or] a nothingness" in the relationship that would not be missed. *Id*. at 44, 48-49. He explained, "developmentally[,] attachment does not begin to occur until approximately the age of six months and then continues most actively-- and the real critical time developmentally is between the ages of six months and approximately eighteen to twenty-four months." *Id*. at 45. He continued, "in the absence of that, to terminate, to end in this case and a case such as this, the relationship between a parent and child which never existed is essentially nothingness. It has nothing within the experiential basis of that child." *Id*. at 48. Thereafter, Mr. Kagarise surmised, "The short answer is [that] this is what the research in child development indicates." *Id*. at 49.

Our review of the orphans' court's opinion reveals that it did not directly address the needs and welfare of A.P.G. pursuant to § 2511(b) prior to denying Mother's petition under § 2511(a)(1). Although the orphans' court found Mr. Kagarise to be credible and agreed with the expert's ultimate opinion regarding the effect of severing a nonexistent bond, the orphans' court reasoned that the lack of a parent-child bond did not override the determination pursuant to § 2511(a)(1) that Father used reasonable firmness to attempt to establish contact with his child. Thus, it did not engage in a formal needs and welfare analysis.

Normally, we would remand the matter to the orphans' court for its specific needs-and-welfare analysis. "Where, however, the record is sufficiently developed (as is the case here), we may substitute our judgment for that of the trial court and decide the case on the merits." ***M.A.T. v. G.S.T.***, 989 A.2d 11, 21 (Pa.Super, 2010) (*en banc*) (collecting child custody cases). Thus, mindful that the instant case is designated Children's Fast Track and in light of the profound fact that **no** parent-child bond exists between Father and his now four-year-old son, whom he has never met, and the evidence in the certified record concerning A.P.G.'s needs and welfare, including the unrebutted expert opinion that terminating an absentee parent's rights would not harm a child of A.P.G.'s age and maturity, it is not necessary to remand this case for the orphans' court's restatement of the obvious: "a child who has no bond with a biological parent would not be psychologically harmed if that bond is severed." Trial Court Opinion, 12/12/14, at 20.

Accordingly, we reverse the orphans' court order denying the petition to terminate Father's parental rights and we remand for the entry of an order terminating Father's parental rights to A.P.G. pursuant to § 2511(a)(1) and (b) of the Adoption Act.

Order reversed. Case remanded for entry of an order terminating Father's parent rights. Jurisdiction relinquished.

J-A29026-15

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/2015